The plaintiff, an employee of the defendants, was injured while operating a steam ironing machine, or mangle, by having her right hand caught and drawn between two inward revolving cylinders. There was evidence tending to prove the facts hereinafter mentioned. The machine was about five and a half feet long, three and a half feet wide, five and a half feet *Page 2 
high, and weighed about 2,400 pounds. It was fastened to the floor of a building by lag screws, with no supports underneath excepting the floor timbers. It consisted of several horizontal, parallel, iron cylinders connected with its main shaft by gearing. One of the cylinders — the "steam cylinder" — was fifteen to twenty inches in diameter, and was located near the front of the machine about half the distance from its top to the floor. This weighed some 800 pounds and when in use was heated by steam. Directly above it there was another cylinder — the "feed roll" — which was six or eight inches in diameter. This was covered with felting and cloth, and its surface was in contact with that of the steam cylinder. There was a shelf eight or ten inches wide, the top surface of which was in or near the horizontal plane that was tangent to the perpendicular diameter of the steam cylinder. There was a guard rail an inch in diameter attached to the table about five inches in front of the line of contact of the two cylinders. Its office was to prevent the operator from getting her hands between the cylinders; and it should be so near the shelf that the hands would not pass between it and the shelf. The feed roll was supported at each end by a box attached to the frame of the machine and inclined somewhat toward the front. In this box there was an axle box in which the end of the axle of the roll was inserted, and which would move up and down to a limited extent. There was a stiff spiral spring between the top of the axle box and a cap at the top of the fixed box, which could be compressed or allowed to expand by turning a set screw passing through the cap, thereby increasing or diminishing the pressure of the feed roll upon the steam cylinder. There were two other rolls back of the feed roll. The operator of the machine stood in front of the shelf, and spreading the article to be ironed upon the shelf and taking hold of each side, pushed its farther edge toward the cylinders until it was caught by them, when it was drawn through to the other side of the machine, and in passing was pressed upon the hot steam cylinder by the feed roll, and ironed. Power was communicated to the machine by a belt running from an overhead pulley to a pulley on the left-hand end of the machine. The lever for shipping the belt and starting or stopping the machine was at this end, and was inaccessible to the operator when in front of the machine. A shaft extended from the pulley at the left-hand end of the machine to a small gear at the right-hand end, which in connection with a counter-shaft and other gearing at the opposite end revolved the cylinders.
The teeth of the gears and some of the boxes in which axles ran were badly worn. As a consequence, there was considerable play in the gears and bearings. The teeth of the driving gear and *Page 3 
its companion were so worn that some of them would skip each other in passing. If they skipped, the tendency was to shake or sway the machine, and also to cause irregular motion in its cylinders. The defendants knew of the worn condition of the gearing and bearings two months before the accident, and that the machine ought to have new gears. The guard rail was supported above the shelf by blocks at such a height that the operator's hands would pass underneath it, and it was so limber that it could be easily sprung. The set screw at the right-hand end of the feed roll would work loose, making the pressure of the roll upon the steam cylinder at that end less than at the other end. This caused the portion of the article passing between the cylinders at that end to wrinkle. The driving belt was old and had three or four splices in it. The absence of special supports under the machine, the height of the machine as compared with its width, the height of its center of gravity, the worn condition of the gears and boxes, the splices in the driving belt, all had a tendency to cause the machine to sway backward and forward. One witness testified that, in his opinion, the top of the machine would sway one to two inches from these causes combined if the teeth of the driving gear and its companion skipped.
At the time of the accident the plaintiff, a woman thirty years old, had operated the machine parts of two seasons, or about six months in all. This was her only experience in running a mangle, and she was never instructed about the character of the machine or the dangers incident to operating it. She testified that she did not know what the special office of the guard rail was. She knew she could pass her hands under it. She also testified that she was very careful to keep her hands as far from the cylinders as possible. She was engaged in running a sheet through the machine when suddenly there was a loud noise as if two pieces of iron came together; and at the same time, according to her testimony, the feed roll jumped toward her, caught her right hand, and drew it between the cylinders. The machine had never made so loud a noise before, and the roll had never jumped in that way. She testified that she was watching her work at the time, and did not intentionally thrust her fingers against the cylinders.
The defendants admit that there were defects in the machine, but they say (1) that the plaintiff's injury was caused by her own negligence instead of by the defects, and (2) that if it was attributable to any or all of the defects, the plaintiff knew of them and consequently assumed the risk of injury by them. They say there was not sufficient evidence from which a jury could properly find in favor of the plaintiff upon the questions of fact involved in these propositions. *Page 4 
It must be assumed that the plaintiff knew of and appreciated the danger that would arise from allowing her hands to come in contact with the inward revolving cylinders. The danger was obvious, and a person of her age and experience required no instruction to cause her to appreciate it. Connolly v. Eldredge, 160 Mass. 566. In fact, she discloses her appreciation of it by her testimony that she was careful to keep her hands as far away from the cylinders as she could. If the only defects in the machine were the unusual height of the guard rail and its limberness, the defendants' propositions might be sustained. But there were other defects which in combination, according to the testimony, were liable to cause the top of the machine to suddenly sway toward the operator. There was no evidence tending to prove that the plaintiff knew of the absence of a suitable foundation for the machine, or of the character of the driving belt, or of the state of repair of the gearing and axle boxes, or of the effect of these several conditions upon the running of the machine. These things were not so apparent that it must be assumed she knew of them. The vibrations of the machine and the irregularity in the motion of the cylinders, which she noticed in her prior experience with it, were not of such magnitude as to direct her attention to the causes, or to warn her of the possibility of the machine's swaying as much as an inch or two, or of any danger arising specially from the vibrations and irregularity. The machine had never acted before as it did on this occasion. The plaintiff described its action as "jumping." In reply to questions by the defendants' counsel, she said: "I suppose it must have been the top roll that jumped"; "it jumped on my hand"; "it must certainly have jumped out of its place"; "I thought it was the whole machine." She gave other similar descriptions. The defendants seem to have understood that by this testimony the plaintiff conveyed the idea that the feed roll sprung upon her hand, clear of the fixed boxes which confined it, and that the whole machine left its moorings and bodily sprung toward her; and, because it conclusively appeared from other testimony that this did not, and from the nature of things could not happen, they argue that a jury could not properly find in favor of the plaintiff. This would be so if the jury understood the testimony in that way; but if they understood from it, as they reasonably might, that the feed roll moved quickly, or sprung in an upward direction from its normal position in the fixed boxes, and the top of the machine swayed suddenly toward the plaintiff, the effect of the testimony would be the opposite of that which the defendants attach to it. The swaying of the top of the machine toward the plaintiff would bring the cylinders nearer her hands unless she withdrew them, and the upward spring *Page 5 
of the feed roll would open a space between it and the steam cylinder for the admission of her fingers. If her hands rested upon the shelf while engaged in pressing the sheet towards the cylinders, a sudden sway of the machine toward her might move the shelf without moving her hands with it.
The plaintiff testified further that only the portions of her fingers beyond the first joints were inside the guard rail. The evidence did not tend to prove that the machine would sway so much as four inches. The defendants argue from this testimony, in connection with the fact that the space between the guard rail and the cylinders was five inches, that the jury could not properly find that the injury was due to a swaying of the machine. It is unlikely that the plaintiff could state the exact position of her fingers the moment before the accident. She said she could not do so. A jury may find from her testimony and other facts proved that she negligently got them against the cylinders; or they may find that she was exercising ordinary care, and her fingers were in a position where they would not have been caught but for a sudden and extraordinary swaying of the machine toward her, owing to its defective condition and to instability in its foundation. The finding must necessarily largely depend upon the credit and weight which are given to the testimony of the plaintiff herself. The testimony of statements made by her that she was trying to smooth wrinkles in the sheet, and so got her hand against the cylinders, does not affect the question of law under consideration. It is the province of the jury to sift and weigh conflicting evidence, and find the truth. Generally, they are greatly aided in performing this service by the appearance of the witnesses. There was evidence from which, if believed, reasonable and impartial men might properly find that the plaintiff was exercising ordinary care, and that her injury would not have happened but for a sudden swaying of the machine toward her, owing, among other things, to defective gearings and instability in the machine's supports — defects of which she did not actually or impliedly have knowledge, so far as appears, and the risk of injury from which she did not assume as a matter of law.
Exception overruled.
All concurred. *Page 6